IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

        Plaintiff,                                    Criminal No. 14-0180
                                                       ELECTRONICALLY FILED

   v.

ELIONARDO JUAREZ-ESCOBAR,

        Defendant.

**MEMORANDUM OPINION AND ORDER OF COURT RE: APPLICABILITY OF
PRESIDENT OBAMA'S NOVEMBER 20, 2014 EXECUTIVE ACTION ON
IMMIGRATION TO THIS DEFENDANT**

On November 20, 2014, President Obama announced an Executive Action on

immigration, which will affect approximately four million undocumented immigrants who are

unlawfully present in the United States of America.  This Executive Action raises concerns about

the separation of powers between the legislative and executive branches of government.  This

core constitutional issue necessitates judicial review to ensure that executive power is governed

by and answerable to the law such that "the sword that executeth the law is in it, and not above

it."  Laurence Tribe, *American Constitutional Law*, 630 (3ed.-Vol. 1) (2000), quoting James

Harrington, *The Commonwealth of Oceana* 25 (J.G.A. Pocock ed. 1992)(originally published

1656).

The Court, in this Memorandum Opinion, addresses the applicability of this Executive

Action to Elionardo Juarez-Escobar, an undocumented immigrant, who has pled guilty to re-

entry of a removed alien in violation of 8 U.S.C. § 1326, and who is awaiting sentencing.

I.      **Introduction**[1]

Defendant is approximately 42 years of age.  He was born in Honduras and his first language is Spanish.  On October 21, 2005, Defendant was arrested in Lordsburg, New Mexico, by the United States Border Patrol.  He was subsequently issued an Expedited Removal Order (via an administrative procedure), and was formally removed from the United States on December 5, 2005.

During the change of plea hearing held by this Court, Defendant testified, through a court-appointed interpreter, and with the assistance of court-appointed counsel, that he returned to the United States in the following manner: At an unknown time after 2005, Defendant traveled by land from Mexico and entered into the United States through Texas.  While in Texas, Defendant saw an advertisement in a local newspaper for transportation vans.  Defendant responded to the advertisement and paid an individual to drive him from Texas to New York.  Once in New York, a friend drove Defendant to Pittsburgh to be re-united with his brother.

Defendant's brother is a citizen of the United States and owns a landscaping business in Pittsburgh.  Defendant has worked for his brother's landscaping business for at least two (2) years.  He has also done painting and construction work for friends while he has resided in the United States.  Defendant presumably came to the United States in an attempt to make money and in search of a better quality of life than he had in Honduras.  Defendant attempted to "file" income taxes for "a couple of years," but was unable to do so because he does not have a Social Security number.

---

[1] Much of the information known about Defendant and set forth in Section "I.," *infra.*, was obtained via a Pre-Plea Presentence Investigation Report.  Doc. No. 20.  This Court ordered the Probation Office to prepare this Report on September 10, 2014, covering Defendant's criminal and work history.  This Report, like all Presentence Investigation Reports, was filed under seal.  Much of what is contained in the Report was reiterated by Defendant at his change of plea hearing.  Id.  Defendant communicated with his Counsel and the Court through a certified court-appointed interpreter.

On April 7, 2014, Defendant was stopped by a New Sewickley Township Police Officer after he drove his vehicle around a traffic stop.  The Officer noticed open beer cans in the back seat of the vehicle and observed that Defendant might be intoxicated.  Henry Gomez, a minor, was also present in the vehicle.  Defendant failed field sobriety tests and submitted to a blood test at Heritage Valley Medical Center-Beaver.  His blood alcohol level was .180%, which is above Pennsylvania's legal limit of alcohol of .08%.  Defendant was released pending the filing of a criminal complaint.  As a result of this encounter, Defendant was charged with two (2) counts of Driving under the Influence of Drugs or Alcohol, Corruption of Minors, Selling/Furnishing Liquor to a Minor, and Driving Without a License.[2]  CR 208-2014/T468050-2.

On June 23, 2014, Defendant's immigration status was referred to the United States Department of Homeland Security ("Homeland Security").  Homeland Security determined that Defendant was unlawfully present in the United States because he had been removed from the United States on December 5, 2005, and had thereafter re-entered the country without the permission of the United States Attorney General or the Secretary of the Department of Homeland Security.

## II.     Procedural Posture

### A. How Defendant's Case Came to be before this Court

Defendant appears before this Court, in part, because of arguably unequal and arbitrary immigration enforcement in the United States.

As noted above, a New Sewickley Township Police Officer arrested Defendant and Homeland Security was notified of his potential undocumented status following his arrest.  The

---

[2] During the October 21, 2014, change of plea hearing, Defendant denied purchasing alcohol for a minor or providing alcohol to the minor passenger.  Defendant stated that the minor passenger "had not been drinking."  Defendant also denied that he was driving without a license and contended that he had an international driver's license.

Commonwealth of Pennsylvania is not a "sanctuary state."  There is very little "official"

information concerning "sanctuary cities" or "sanctuary states."  In *Veasey v. Perry*, 13-CV-

00193, 2014 WL 5090258, *17, fn 149 (S.D. Tex. October 09, 2014), a Federal Judge for the

United States District Court for the Southern District of Texas defined "sanctuary cities" as

"cities that have refused to fund law enforcement efforts to look for immigration law violators,

leaving that to the federal government.  S.J. of Tex., 82nd Leg., R.S. 8 (2011) (designating the

elimination of sanctuary cities as a legislative emergency)."

Had Defendant been arrested in a "sanctuary state" or a "sanctuary city," local law

enforcement likely would not have reported him to Homeland Security.  If Defendant had not

been reported to Homeland Security, he would likely not have been indicted for one count of re-

entry of a removed alien in violation of 8 U.S.C. § 1326.

Further, neither a federal indictment nor deportation proceedings were inevitable, even

after Immigration and Customs Enforcement ("ICE"), a division of Homeland Security, became

involved.  In 2013, ICE personnel declined to bring charges against thousands of undocumented

immigrants who had previous criminal convictions.[3]

Therefore, Defendant possibly would not be facing sentencing and/or deportation if he

had been arrested under the same circumstances, but in another city/state or if different ICE

personnel had reviewed his case.

---

[3] The Court notes that an Immigration Enforcement Report, for the fiscal year 2013, by ICE, indicates that ICE reported 722,000 encounters with undocumented immigrants, most of whom came to their attention after incarceration for a local arrest.  However, this Report also notes that the ICE officials followed through with immigration charges for only 195,000 of these individuals.  Among those released by ICE, 68,000 had criminal convictions, and 36,007 of the convicted undocumented immigrants freed from ICE custody, in many instances, had multiple convictions, some of which included: homicide, sexual assault, kidnapping, aggravated assault, aggravated assault, stolen vehicles, dangerous drugs, drunk or drugged driving, and flight/escape. See FY 2013 ICE Immigration Removals, December 2013 accessed through http://www.ice.gov/removal-statistics/.

### B. Procedural History to Date

Defendant has been incarcerated since July 22, 2014, when he was arrested and detained by Homeland Security.  On July 29, 2014, a grand jury returned an indictment against Defendant for one count of re-entry of a removed alien in violation of 8 U.S.C. § 1326.  Doc. No. 1. Defendant appeared before United States Magistrate Judge Maureen P. Kelly for an Initial Appearance and, a few days later, for an Arraignment.  Doc. Nos. 6, 12.  Defendant, through a court-appointed interpreter, and with assistance of counsel, pled not guilty to the charge.  Doc. No. 13.

The Court was informed of Defendant's decision to change his plea to guilty and proceed to sentencing in late August, 2014.  The Court scheduled a hearing thereon for October 21, 2014, based upon the availability of a certified court-appointed interpreter.  09/09/2014 Text Order. The Court ordered the United States Probation Office to file a Pre-Plea Presentence Investigation Report addressing Defendant's criminal and work history in preparation for the change of plea and sentencing hearing.  Doc. No. 19.

On October 21, 2014, the Court held a hearing, which Defendant, his counsel, and Assistant United States Attorney Eberle attended.  Doc. No. 24.  There was no plea agreement in this case.

During the hearing, the Court informed Defendant of his rights, and the consequences of waiving those rights, including potential deportation, if Defendant pled guilty.  Id.  The Assistant United States Attorney outlined that Defendant had been physically removed from the United States in 2005, and had been informed, at that time, that he could not re-enter the United States without obtaining permission from the United States Attorney General or the Secretary of the Department of Homeland Security prior to any re-entry into the country.  Defendant was found

to be "in the United States" as a result of his April 7, 2014, encounter with law enforcement. Defendant did not have permission from the United States Attorney General or the Secretary of the Department of Homeland Security to be in the United States.

During the change of plea hearing, Defendant accepted responsibility for his actions, evidenced that he understood his rights, and proceeded to waive his right to a trial and pled guilty to one count of re-entry of removed alien, as charged in the indictment. Doc. No. 25. The Court asked the Assistant United States Attorney to inquire into whether Defendant's employers had reported Defendant's wages for federal tax purposes. The sentencing hearing will be scheduled by this Court.

Historically, this Court has sentenced defendants who are charged with unlawfully re-entering the United States to time-served (normally within an advisory sentencing guideline range of 0-6 months) and one (1) year supervised release with the added condition that the defendant shall not re-enter the United States, without lawful authorization. The Court also customarily orders that supervised release be suspended due to anticipated removal/deportation.

In this case, Defendant's applicable advisory guideline range, based upon an offense level of 6 and a criminal history category of I, is 0-6 months imprisonment. Doc. No. 20. The date of January 22, 2015, six (6) months after Defendant's detention by Homeland Security, marks the end of this time period. A term of supervised release of not more than one (1) year may also be imposed as part of Defendant's sentence. Id.

### C.  Request for Legal Briefing by This Court

On November 24, 2014, in light of the recently announced Executive Action, the Court requested counsel for the Government and for Defendant to brief the following issues, on or before noon on December 5, 2014:

1. Does the Executive Action announced by President Obama on November 20, 2014, apply to this Defendant?

    A. If yes, please provide the factual basis and legal reasoning.

    B. If no, please provide the factual basis and legal reasoning.

2. Are there any constitutional and/or statutory considerations that this Court needs to address as to this Defendant? If so, what are those constitutional and/or statutory considerations, and how should the Court resolve these issues?

Doc. No. 26.  The Court also invited any interested *amicus* to submit briefs by the same date.  Id.  Any party could file a response thereto on or before noon on December 11, 2014.  Id.

The Government, in its four (4) page response thereto, contended that the Executive Action is inapplicable to criminal prosecutions under 8 U.S.C. § 1326(a), and argued that the Executive Action solely relates to civil immigration enforcement status.  Doc. No. 30.

Defense Counsel indicated that, as to this Defendant, the Executive Action "created an additional avenue of deferred action that will be available for undocumented parents of United States citizen[s] or permanent resident children."[4]  Doc. No. 31, 3.   In addition, Defense Counsel noted that the United States Citizenship and Immigration Services ("USCIS") "has announced that certain citizens of Honduras living in the United States are eligible to extend their Temporary Protected Status (TPS) so as to protect them from turmoil facing the citizens of that nation."  Id. at 5.

---

[4] As of this writing, it is still unknown whether this Defendant is the father or step-father of a United States citizen or permanent resident.  In addition, as Defense Counsel points out in his Brief, the "parental" form of deferred action, as described by President Obama in his Executive Action, will not be available for at least 180 days.  However, depending on the length of sentence imposed by this Court, and/or the options that Defendant may choose given the status of his criminal case (which will be discussed *infra*.), the 180 days may elapse before Defendant appears before an Immigration Judge in a civil removal proceeding.

**III.    Is President Obama's November 20, 2014 Executive Action on Immigration Constitutional or Unconstitutional?**

    **A.  Separation of Powers Under the Constitution**

Under our system of government in the United States, Congress enacts laws and the President, acting at times through agencies, "faithfully execute[s]" them. U.S. Const., Art. II, § 3 (the "Take Care Clause"; also known as the "Faithful Execution Clause").

In *N.L.R.B. v. Canning,* the United States Supreme Court reiterated that:

> [T]he separation of powers can serve to safeguard individual liberty . . . and that it is the "duty of the judicial department" – in a separation-of-powers case as in any other – "to say what the law is," *Marbury v. Madison*, 1 Cranch 137, 177, 2 L.Ed. 60 (1803).

573 U.S. ___, 134 S.Ct. 2550, 2559-60 (Jun. 26, 2014).

The Court requested that the parties provide briefs to assist the Court in determining whether the Executive Action on immigration announced on November 20, 2014, would impact the sentencing of this Defendant.  Specifically, this Court was concerned that the Executive Action might have an impact on this matter, including any subsequent removal or deportation, and thereby requiring the Court to ascertain whether the nature of the Executive Action is executive or legislative.

    **B.  Substance of the Executive Action**

On November 20, 2014, President Obama addressed the Nation in a televised speech, during which he outlined an Executive Action on immigration.  Text of Speech: http://www.whitehouse.gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration.  President Obama stated that the immigration system is "broken," in part because some "play by the rules [but] watch others flout the rules."  President Obama outlined that he had taken actions to secure the borders and worked with Congress in a failed attempt to reach a legislative solution.  However, he stated that lack of substantive legislation necessitated that his

administration take the following actions "that will help make our immigration system more fair and more just":

> First, we'll build on our progress at the border with additional resources for our law enforcement personnel so that they can stem the flow of illegal crossings, and speed the return of those who do cross over.
>
> Second, I'll make it easier and faster for high-skilled immigrants, graduates, and entrepreneurs to stay and contribute to our economy, as so many business leaders have proposed.
>
> Third, we'll take steps to deal responsibility with the millions of undocumented immigrants who already live in our country.

As to this third action, which may affect Defendant, President Obama stated that he would prioritize deportations on "actual threats to our security."  The President also announced the following "deal":

> If you've been in America for more than five years; if you have children who are American citizens or legal residents; if you register, pass a criminal background check, and you're willing to pay your fair share of taxes -- you'll be able to apply to stay in this country temporarily without fear of deportation.  You can come out of the shadows and get right with the law.  That's what this deal is.

Thus, in essence, the President's November 20, 2014 Executive Action announced two different "enforcement" policies: (1) a policy that expanded the granting of deferred action status to certain categories of undocumented immigrants; and, (2) a policy that updated the removal/deportation priorities for certain categories of undocumented immigrants.

### 1.  Deferred Action

The first policy (on deferred action) provides that individuals who fall within each of these proscribed categories would not be deported by President Obama's administration.  ("All we're saying is that we're not going to deport you.")  According to the President, his Executive Action does not grant citizenship, the right to permanent residence, or entitlement to benefits of citizenship, and does not apply to individuals who: (1) have "recently" come to the United

States; or (2) those who might come in the future.  However, the Executive Action does "create" substantive rights, including legal work authorization documentation, access to social security numbers, and other tangible benefits.

This Executive Action has been implemented through Memoranda by the Secretary of the Department of Homeland Security.  Ex. Jeh Charles Johnson, Secretary, U.S. Department of Homeland Security, *Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children and with Respect to Certain Individuals Who are the Parents of U.S. Citizens or Permanent Residents*, November 20, 2014.  Under the Executive Action and applicable administrative guidance, an undocumented immigrant would be eligible for deferred action if he or she applied for deferred action and if he or she:

(1) is not an enforcement priority under Department of Homeland Security Policy;

(2) has continuously resided in the United States since before January 1, 2010;

(3) is physically present in the United States both when Homeland Security announces its program and at the time of application for deferred action;

(4) has a child who is a U.S. citizen or Lawful Permanent Residence; and

(5) presents "no other factors that, in exercise of discretion, make[] the grant of deferred action inappropriate."

Karl R. Thompson, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C., 25, November 19, 2014, citing Johnson Deferred Action Memorandum at 4.

### 2.   Removal Deportation Priorities

The Department of Homeland Security has issued a Memorandum to reflect the priorities for deportation referenced in President Obama's November 20, 2014 Executive Action, which will become effective on January 5, 2015.  Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*, November 20, 2014.  Individuals who may otherwise qualify for deferred deportation under the Executive Action, will <u>not</u> be permitted to apply for deferred action if they are classified in one of the three (3) categories of individuals who will be prioritized for deportation.  The Secretary of Homeland Security provided that the civil immigration enforcement priorities (apprehension and removal) will be as follows:

- Priority 1 (threats to national security, border security, and public safety), which includes those who: are engaged in or suspected or terrorism or espionage; are apprehended attempting to enter the United States; have been convicted of an offense involving gangs; have been convicted of a felony "other than a state or local offense for which an essential element was the alien's immigration status"; <u>and</u> have been convicted of an "aggravated felony";

- Priority 2 (misdemeanants and new immigration violators), which includes those who have been: convicted of three or more misdemeanor offenses arising out of three separate incidents (other than minor traffic offenses or state or local offenses involving their immigration status); convicted of a "significant misdemeanor"; apprehended after "unlawfully entering or re-entering the United States and cannot establish to the satisfaction of an immigration officer that they have been physically present in the United States continuously since January 1, 2014"; <u>and</u> found to have significantly abused the visa or visa waiver programs; and

- Priority 3 (other immigration violations), which includes those who have been issued a final order of removal on or after January 1, 2014.

Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants* (emphasis added).

The Memorandum sets forth that individuals in all three (3) of these priority groups should be removed from the United States <u>unless</u> they qualify for asylum or other forms of relief.[5]  Further, undocumented immigrants who are not within these categories may be removed "provided, in the judgment of an ICE Field Office Director, removing such an alien would serve an important federal interest."  Id.  All decisions regarding deportation are to be based on the totality of the circumstances.  Id.

### C.  Differentiation Between Executive Action and Executive Order

Authority for Executive Actions and Orders must be based upon: (1) the Constitution; (2) statutes or treaties; or (3) the President's inherent authority to ensure that the laws are "faithfully executed."  These powers are limited, even during times of national crisis.  Tribe, *American Constitutional Law* at 670-71.  Although the Framers of the Constitution and Congress have not defined the instruments of Presidential authority, including executive orders and executive actions, these terms are not interchangeable.  John Contrubis, *Executive Orders and Proclamations*, Congressional Research Service Report for Congress (95-772 A)(updated March 9, 1999).

The House Government Operations Committee has provided the following description of an Executive Order:

---

[5] The Brief submitted on behalf of Defendant noted that certain citizens of Honduras living in the United States are eligible to extend their Temporary Protected Status ("TPS") so as to protect them from turmoil facing the citizens of that country.  Defendant is a citizen of Honduras.  Doc. No. 31.  Given just these facts, this Court does not know as of this writing if Defendant would be among the individuals who would be eligible to qualify for asylum or other forms of relief.

> Executive orders and proclamations are directives or actions by the President.
> When they are founded on the authority of the President derived from the
> Constitution or statute, they may have the force and effect of law . . . . In the
> narrower sense Executive [O]rders are generally directed to, and govern actions
> by, Government officials and agencies.  They usually affect private individuals
> only indirectly.

Staff of House Comm. on Government Operations, 85th Cong., 1st Sess., *Executive Orders and Proclamations: A Study on the Use of Presidential Powers* (Comm. Print 1957).  Executive Orders are required to be published in the Federal Register.  44 U.S.C. § 1505.

Federal Courts can review the constitutionality of Executive Orders.  In two instances, Federal Courts have found that specific Executive Orders were unconstitutional.  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) (the United States Supreme Court found that President Truman's Executive Order authorizing the Secretary of Commerce to control operation of the majority of the country's steel mills was unconstitutional because President Truman acted without constitutional or statutory authority); *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996), rehearing denied, 83 F.3d 442 (D.C. Cir. 1996) (the United States Court of Appeals for the District of Columbia Circuit found a 1995 Executive Order issued by President Clinton, which prevented employers who were performing under federal contracts from hiring strike breakers, to be unlawful because it impermissibly prevented employers from hiring their chosen workers).

Executive Actions do not have a legal definition.  Executive Actions have been used by Presidents to call on Congress or his Administration to take action or refrain from taking action (*e.g.,* Executive Actions, issued in January 2014 by President Obama, re. boosting federal background-checks for firearm purchases).  Executive Actions are not published in the Federal Register.

**D. President Obama's Historic Position that Executive Action/Executive Orders on Immigration Would Exceed His Executive Authority**

President Obama has stated that he is constrained from issuing an Executive Action/Order on immigration because such action would exceed his executive powers as demonstrated by the following:

- America is a nation of laws, which means I, as the President, am obligated to enforce the law.  I don't have a choice about that.  That's part of my job.  But I can advocate for changes in the law so that we have a country that is both respectful of the law but also continues to be a great nation of immigrants. . . . With respect to the notion that I can just suspend deportations through executive order, that's just not the case, because there are laws on the books that Congress has passed . . . [W]e've got three branches of government.  Congress passes the law.  The executive branch's job is to enforce and implement those laws.  And then the judiciary has to interpret the laws.  There are enough laws on the books by Congress that are very clear in terms of how we have to enforce our immigration system that for me to simply through executive order ignore those congressional mandates would not conform with my appropriate role as President. March 28, 2011, http://www.whitehouse.gov/the-press-office/2011/03/28/ remarks-president-univision-town-hall

- . . . sometimes when I talk to immigration advocates, they wish I could just bypass Congress and change the law myself.  But that's not how a democracy works.  What we really need to do is to keep up the fight to pass genuine, comprehensive reform.  That is the ultimate solution to this problem.  That's what I'm committed to doing.  May 10, 2011, http://www.whitehouse.gov/the-press-

office/2011/05/10/remarks-president-comprehensive-immigration-reform-el-paso-texas

- Now, I swore an oath to uphold the laws on the books. . . .  Now, I know some people want me to bypass Congress and change the laws on my own. . . .  Believe me, the idea of doing things on my own is very tempting.  I promise you.  Not just on immigration reform.  But that's not how - - that's not how our system works.  That's not how our democracy functions.  That's not how our Constitution is written.  July 25, 2011, http://www.whitehouse.gov/the-press-office/2011/07/25/remarks-president-national-council-la-raza

President Obama's statements evidence that prior to November 20, 2014, he viewed an Executive Action, similar to the one issued, as beyond his executive authority.

President Obama has also evidenced that systematic categories of delayed deportations would be impracticable and unfair.

- [T]here are those in the immigrants' rights community who have argued passionately that we should simply provide those who are [here] illegally with legal status, or at least ignore the laws on the books and put an end to deportation until we have better laws. . . .  I believe such an indiscriminate approach would be both unwise and unfair.  It would suggest to those thinking about coming here illegally that there will be no repercussions for such a decision.  And this could lead to a surge in more illegal immigration.  And it would also ignore the millions of people around the world who are waiting in line to come here legally.  Ultimately, our nation, like all nations, has the right and obligation to control its borders and set laws for residency and citizenship.  And no matter how decent

they are, no matter their reasons, the 11 million who broke these laws should be
held accountable.  July 1, 2010, http://www.whitehouse.gov/the-press-
office/remarks-president-comprehensive-immigration-reform

While President Obama's historic statements are not dispositive of the constitutionality of
his Executive Action on immigration, they cause this Court pause.  The Court must examine
whether this Executive Action is within the President's executive authority, and whether it would
unjustly and unequally impact this Defendant in light of this Court's obligation to avoid
sentencing disparities among defendants with similar records who have been found guilty of
similar conduct.  18 U.S.C. § 3553(a)(6).

### E.  The Obama Administration's Justification for the Executive Action

#### 1.  Opinion of the Office of Legal Counsel

On November 19, 2014, the Office of Legal Counsel of the United States Department of
Justice issued a Memorandum Opinion for the Secretary of Homeland Security and the Counsel
to the President, which addressed the following: (1) whether, in light of Homeland Security's
limited resources to remove undocumented immigrants, it would be permissible for the
Department to implement a policy "prioritizing the removal of certain categories of aliens over
others"; and (2) whether it would be permissible for Homeland Security to extend deferred action
to certain aliens who are the parents[6] of children who are present in the United States.
Thompson, *The Department of Homeland Security's Authority to Prioritize Removal of Certain
Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 38 Op. O.L.C
___.

---

[6] The Memorandum Opinion does not state whether grandparents are included within the term "parents."
If not, such an arbitrary and anti-grandparent position demonstrates a lack of true understanding of
"family."

16

The Office of Legal Counsel advised that the then proposed Executive Action would be within the lawful scope of Homeland Security's discretion to enforce immigration laws because:

- Congress has passed legislation permitting certain classes of individuals to be eligible for deferred action (*e.g.*, immediate family of Lawful Permanent Residents who were killed on September 11, 2001), USA PATRIOT Act of 2001, Pub. L. No. 107-56 § 423(b), 115 Stat. 272, 361;

- Congressional legislation emphasizes uniting undocumented immigrants with lawfully present family members;

- Congress "has never acted to disapprove or limit" categorical deferred action;

- Congress has enacted legislation "appearing" to endorse deferred deportation programs;

- The Executive Action reflects considerations within the Agency's expertise;

- The Executive Action is of temporary duration; and

- Immigration officials retain discretion to screen undocumented immigrants on a case-by-case basis to determine whether their application for deferred deportation is approved, thereby avoiding the creation of a rule-like entitlement to immigration relief or abdicating DHS's enforcement responsibilities for a particular class of aliens.

## 2. President Obama's Justification

President Obama contended, in his televised address, that his Executive Action is "lawful" and akin to actions taken by other Presidents, both Republican and Democratic.  The sole citation to authority in the President's speech was from the Old Testament.  Exodus 22:21 (paraphrased by President Obama as "we shall not oppress a stranger, for we know the heart of a stranger – we were strangers once, too.").  President Obama has stated: (1) that his Executive Action was justified by Congressional inaction, and (2) that his Executive Action is authorized by his prosecutorial discretion to defer immigration actions.

**F. The November 20, 2014 Executive Action on Immigration is Unconstitutional**

In determining whether the Executive Action is applicable to this Defendant, this Court must first determine whether the Executive Action is constitutional. The Court is bound to ensure that the Constitution's structural safeguards are preserved. *N.L.R.B. v. New Vista Nursing and Rehabilitation*, 719 F.3d 203, 241 (3d Cir. 2013), *citing Baker v. Carr*, 369 U.S. 186, 211 (U.S. 1962). This role cannot be shared with other branches of government "anymore than the president can share his veto power or Congress can share its power to override vetoes." *Id. See also United States v. Nixon*, 418 U.S. 683, 704-05 (1974).

**1. Inaction by Congress Does Not Make Unconstitutional Executive Action Constitutional**

President Obama contended that although legislation is the most appropriate course of action to solve the immigration debate, his Executive Action was necessary because of Congress's failure to pass legislation, acceptable to him, in this regard. This proposition is arbitrary and does not negate the requirement that the November 20, 2014 Executive Action be lawfully within the President's executive authority. It is not.

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad." *Youngstown*, 343 U.S. at 587.

Congress's lawmaking power is not subject to Presidential supervision or control. *Youngstown*, 343 U.S. at 587. Perceived or actual Congressional inaction does not endow legislative power with the Executive. This measurement - - the amount/length of Congressional inaction that must occur before the Executive can legislate - - is impossible to apply, arbitrary, and could further stymie the legislative process.

18

The temporal limits of so called "inaction" is arbitrary because of considerations such as when the "clock" on inaction would begin and how long inaction would have to persist before otherwise unlawful legislative Executive Action would become lawful.  For example, would it be permissible for a President, who was dissatisfied with a high tax rate on long term capital gains (as limiting economic growth), to instruct the IRS to only collect taxes at a rate of 15% rather than the legislative prescribed 20% rate, or defer prosecution of any taxpayer who pays at least 15% but not the full 20%, unless Congress "pass a bill" lowering the rate within a specified time period?  Both this IRS scenario and the Executive Action at issue in this case violate the separation of powers.

President Obama stated that the only recourse available to those members of Congress who question his wisdom or authority in this regard would be to "pass a bill" and that "the day I sign that bill into law, the actions I take will no longer be necessary."  Presidential action may not serve as a stop-gap or a bargaining chip to be used against the legislative branch.  While "the power of executing the laws necessarily includes both authority and responsibility to resolve some questions left open by Congress that arise during the law's administration," it does not include unilateral implementation of legislative policies.  *Utility Air Regulatory Group v. E.P.A.,* 134 S.Ct. 2427, 2446 (Jun. 23, 2014).

Further, President Obama's belief that this Executive Action is within his executive authority is not dispositive because "the separation of powers does not depend on the views of individual Presidents, nor on whether 'the encroached-upon branch approves the encroachment.'"  *N.L.R.B.*, 719 F.3d at 241, *citing Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477, 130 S.Ct. 3138, 3155 (2010), *quoting New York v. United States*, 505 U.S. 144, 182 (1992).  Likewise, Congress's alleged "failure" to pass

legislation invalidating or limiting past Executive Actions or Orders relating to deferred action does not evidence that such exercises are lawful, and does not constitute a grant of legislative authority to the Executive.

This Executive Action "cross[es] the line," constitutes "legislation," and effectively changes the United States' immigration policy. The President may only "take Care that the Laws be faithfully executed . . . "; he may not take any Executive Action that creates laws. U.S. Const., Art. II, § 3.

## 2. Executive Action Goes Beyond Prosecutorial Discretion – It is Legislation

Presidents and certain members of their administrative agencies may exercise prosecutorial discretion over certain criminal matters on a case-by-case basis. Prosecutorial discretion, in the context of immigration, applies to a broad range of discretionary enforcement decisions, including the following:

- whether to issue, serve, file, or cancel a Notice to Appear;

- whom to stop, question, and arrest;

- whom to detain or release;

- whether to settle, dismiss, appeal, or join in a motion on a case; and

- whether to grant deferred action, parole, or a stay of removal instead of pursuing removal in a case.

Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.

President Obama invoked this discretion when he stated that his Executive Action allowed his administration to "prioritize" deportations on "actual threats to our security. Felons, not families. Criminals, not children. Gang members, not a mom who's working hard to provide for her kids."

However, President Obama's November 20, 2014 Executive Action goes beyond prosecutorial discretion because:

(a) it provides for a systematic and rigid process by which a broad group of individuals will be treated differently than others based upon arbitrary classifications, rather than case-by-case examination; and

(b) it allows undocumented immigrants, who fall within these broad categories, to obtain substantive rights.

First, the Executive Action establishes threshold eligibility criteria before undocumented immigrants can apply for deferred action status (*i.e.,* deferred deportation).  The Office of Legal Counsel acknowledged that this class-based program and threshold criteria was problematic, but concluded that the program does not "in and of itself" cross the line between executing the law and "rewriting it."  Despite the so-called case-by-case determination of eligibility for deferred deportation (ex. passing a criminal background check), the threshold criteria will almost wholly determine eligibility.  Such formulaic application of criteria, especially given the wide breadth of the program, in essence, substantively changes the statutory removal system "rather than simply adapting its application to individual circumstances."[7]  Id.

Secondly, the Executive Action goes beyond temporarily deferring deportation for specified groups of undocumented immigrants.  Secretary Johnson, in his Memorandum on prosecutorial discretion, stated that deferred action is legally valid if it is on a case-by-case basis and "may be terminated at any time at the agency's discretion."  Johnson, *Exercising*

---

[7] According to the White House, the Executive Action will apply to more than 4 million undocumented immigrants. http://www.whitehouse.gov/issues/immigration/immigration-action.  There are an estimated 11.2 million unauthorized immigrants in the United States.  Pew Research Center estimates based on residual methodology, applied to 2012 American Community Survey, accessed through http://www.pewresearch.org/fact-tank/2014/11/20/those-from-mexico-will-benefit-most-from-obamas-executive-action/.

*Prosecutorial Discretion*, 2.  The Executive Action provides for a process by which undocumented immigrants will become quasi-United States citizens, such that the status given to those within President Obama's Executive Action could not be "terminated at any time."

Individuals who qualify under the Executive Action are invited to apply for deferred action status.  Those individuals will be permitted to apply for work authorization documentation if they can demonstrate "economic necessity," and they will temporarily cease accruing "unlawful presence" for the purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I).  8 C.F.R. § 214(d)(3) cited in Thompson, *The Department of Homeland Security's Authority to Prioritize Removal of Certain Aliens Unlawfully Present in the United States and to Defer Removal of Others*, 13.  The Administration has based the Executive Action, in large part, on the "humanitarian interest in promoting family unity."  Id. at 26.  This overarching-value will render any rescission of the Executive Action, by legislation or withdrawal by another Administration, arguably unjust as it would violate core American familial values to abruptly deport these individuals, who are "families," not "felons," and have been allowed to deepen and strengthen already existing ties to their lawfully present American family members and the wider community.

### 3. Conclusion

President Obama's unilateral legislative action violates the separation of powers provided for in the United States Constitution as well as the Take Care Clause, and therefore, is unconstitutional.

**IV.     Is the Executive Action Applicable to this Defendant?**

**A.  The Three Priorities for Removal**

On the other hand, if President Obama's Executive Action is constitutional, the Court must determine its applicability to this Defendant.  As noted above, the Department of Homeland Security created a Memorandum, which sets forth implementation of President Obama's Executive Action into three (3) priority groups for removal.

Priority 1 for removal does not apply to this Defendant for the following reasons:  There is no evidence that this Defendant posed or poses a threat to national security, border security, and/or public safety, by engaging in, or being suspected of, terrorism or espionage.  This Defendant was not apprehended while attempting to enter the United States.  There is no evidence that this Defendant has ever been convicted of an offense involving gangs or is a member of a gang.   Finally, there is no evidence that he was convicted of a felony "other than a state or local offense for which an essential element was the alien's immigration status," nor has he been convicted of an "aggravated" felony.

Likewise, Priority 2 for removal does not appear to apply to this Defendant.  Although Priority 2 specifically referenced undocumented immigrants who had illegally re-entered the United States, it only applies to those who have <u>not</u> been in the United States continuously since January 1, 2014.  Johnson, *Policies for the Apprehension, Detention and Removal of Undocumented Immigrants*.   This Defendant re-entered the United States "sometime after 2005" and was arrested in 2014, as noted above.   Thus, it is probable that Defendant has been continuously present in the United States since January 1, 2014.

In addition, Priority 2 also indicates that the undocumented immigrant has to have been convicted of three (3) or more misdemeanor offenses arising out of three (3) separate incidents

(other than minor traffic offenses or state or local offenses involving their immigration status). Here, there is no evidence Defendant has been convicted of three (3) or more offenses arising out of three separate incidents.  Thus, Defendant does not appear to fall into the Priority 2 category.

Finally, an undocumented immigrant may fall be classified within Priority 3 if said person has been issued a final order of removal on or after January 1, 2014.  This has not yet occurred in Defendant's case, and thus, he does not fall within Priority 3 for removal.

Therefore, if the Executive Action is constitutional, its deportation/removal priorities do not apply to Defendant in this case.  As such, once the Executive Action is fully implemented, this Defendant arguably should not be in a "deportation mode" before this Court.[8]

### B.  The Government's Position that the Executive Action Does Not Apply to Defendant

In its well-written brief, the Government argues that the November 20, 2014 Executive Action on immigration is inapplicable this Defendant, even if Defendant is not a priority for deportation.  In short, the Government posits that the Executive Action only impacts civil proceedings, not criminal proceedings, such as the matter at bar.  In support of this argument, the Government cites Secretary Johnson's Memorandum *Policies for Apprehension, Detention and Removal of Undocumented Immigrants*, which it is "arguably relevant to the issues before [this Court]."  Doc. No. 30.  The Government argues that because this particular Memorandum does not "mention § 1326(a) proceedings" – the very proceeding this Court is conducting with respect

---

[8] Although Defendant does not appear to fall within any of the three (3) Priority Deportation Categories, under President Obama's November 20, 2014 Executive Action, he possibly is <u>not</u> eligible for deferred deportation.  The Court notes that Defendant may not have any dependents living in the United States, and if so, he is not a part of the class or subcategory of undocumented immigrants that are eligible for deferred deportation under President Obama's November 20, 2014 Executive Action.  This is but one example of the dichotomy between DHS policy and the President's Executive Action, which makes it difficult to discern what the law is with respect to individuals such as this Defendant.

to this Defendant – this Court need not consider the Memorandum, the Executive Action, or anything else that has taken place in the United States that impact immigration law.

While this Court notes that Secretary Johnson's Memoranda certainly discuss the President's new "civil" immigration policies, and while this Court is aware that this Defendant is before this Court on a criminal matter, the Court disagrees that the Executive Action (and its ten (10) supporting Memoranda) does not impact this criminal proceeding.

First, the Court notes that while deportation or removal is imposed by an immigration judge via a civil proceeding, the civil proceeding often arises after – or as a result of – the individual being convicted of a crime.  In this instant matter, the civil proceeding may commence because Defendant has committed the crime of re-entry of a removed alien in violation of 8 U.S.C. §1326.  Thus, this Court, which arguably has no control over the imposition of the "deportation sanction" (which is left to the civil immigration judge via a separate proceeding), cannot ignore the fact that what happens here, in this criminal proceeding, significantly and determinatively impacts what happens there, in a civil proceeding.

In addition, the United States Supreme Court has acknowledged that deportation is a "drastic measure," see *Padilla v. Kentucky*, 559 U.S. 356, 360 (2010), and described the close nexus between the findings of a federal district court judge in a criminal immigration violation proceeding, and the outcome in a civil immigration proceeding, in this manner:

> We have long recognized that deportation is a particularly severe "penalt*y," Fong Yue Ting v. United States*, 149 U.S. 698, 740, 13 S.Ct. 1016, 37 L.Ed. 905 (1893); but it is not, in a strict sense, a criminal sanction.  Although removal proceedings are civil in nature, see *INS v. Lopez–Mendoza*, 468 U.S. 1032, 1038, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984), deportation is nevertheless intimately related to the criminal process.  Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century, see Part I, *supra*, at 1478–1481.  And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders.  Thus,

> we find it "most difficult" to divorce the penalty from the conviction in the deportation context. *United States v. Russell*, 686 F.2d 35, 38 (C.A.D.C. 1982). Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult. See *St. Cyr*, 533 U.S., at 322, 121 S.Ct. 2271 ("There can be little doubt that, as a general matter, alien defendants considering whether to enter into a plea agreement are acutely aware of the immigration consequences of their convictions").

*Id*. at 365-66.

In light of the impact this Court's criminal proceeding may have on the civil proceeding, and given the Supreme Court's own view on the inextricability between the two proceedings, the Government's argument does not convince this Court that it should ignore the November 20, 2014 Executive Action merely because the President's speech and the Department's Memoranda reference "civil" proceedings.

Moreover, as this Court has also noted, there seems to be an arbitrariness to Defendant's arrest and criminal prosecution for violation of 8 U.S.C. § 1326. Many cities (and some states), in the past, have declared themselves "sanctuary cities," which essentially meant if an undocumented immigrant was arrested for a minor offense, local law enforcement would not automatically notify ICE.

Now, one of the other ten (10) Memoranda by Secretary Johnson implementing the Executive Action, titled "Secure Communities," actually terminates the Secure Communities program, as follows:

> I am directing U.S. Immigration and Customs Enforcement (ICE) to discontinue Secure Communities. ICE should put in its place a program that will continue to rely on fingerprint-based biometric data submitted during bookings by state and local law enforcement agencies to the Federal Bureau of Investigation for criminal background checks. However, ICE should only seek the transfer of an alien in the custody of state or local law enforcement through the new program when the alien has been convicted of an offense listed in Priority 1 (a), (c), (d), and (e) and Priority 2 (a) and (b) of the November 20, 2014 Policies for the

> Apprehension, Detention and Removal of Undocumented Immigrants Memorandum, or when, in the judgment of an ICE Field Office Director, the alien otherwise poses a danger to national security. In other words, unless the alien poses a demonstrable risk to national security, enforcement actions through the new program will only be taken against aliens who are convicted of specifically enumerated crimes.

Johnson, *Secure Communities,* November 20, 2014, 2.

Thus, if Defendant had been arrested within the confines of a "sanctuary city," or if he had been arrested by local police on or after the implementation of the Executive Action, ICE would <u>not</u> have sought "to transfer Defendant into its custody," because this Defendant would not have been convicted of an offense listed in Priority 1 or Priority 2.

Accordingly, Defendant's current criminal prosecution and the civil deportation hearing that will undoubtedly follow as a result of this criminal proceeding, arguably are arbitrary and random.

### C.   Defendant's Position that the Executive Action May Apply to Him, or that He May Have Some Other Claim Enabling Him to Remain in the United States

In his Brief, Defendant's counsel concedes that the Executive Action has raised statutory and constitutional considerations, "but not directly in regard to this criminal matter."  Doc. No. 31, 6.  Presumably, this statement is in line with what the Government counsel argues – that the Executive Action has no direct bearing on this <u>criminal</u> proceeding.  As this Court has discussed in "IV. B." above, the impact this criminal proceeding has on the civil proceeding cannot be ignored.  Nor can the arbitrary nature and application of the Executive Action on those undocumented immigrants who may or may not be specifically identified, either by the three (3) Priority groups slated for speedy deportation, or by the new and newly expanded groups who "qualify" for deferred action status, be ignored.

However, despite suggesting the Executive Action may have no direct application to these proceedings, Defendant notes that the Executive Action: (1) expands deferred action to certain childhood arrivals; (2) creates an additional "avenue of deferred action" for the undocumented parents of United States citizens and permanent resident children; and (3) sets priorities for removal among the undocumented immigrants who pose "national security, border security and public safety threats."  Doc. No. 31, 3.

Defendant argues, and this Court agrees (see above at "IV. A."), that Defendant does not fall within any of the three (3) priorities (Priority 1, Priority 2, or Priority 3) announced in the Executive Action or the supporting Memoranda issued by Secretary Johnson.  Doc. No. 31, 4. Defendant argues that because he does not fall within any of the Priorities, ICE can choose: (1) not to pursue his removal; (2) to grant him deferred action status; or (3) some other form of relief from potential removal from the United States.

Defendant's counsel also notes that Defendant may or may not be a parent or step-parent, but if he is, Defendant suggests that familial relationship would bolster his non-deportation and/or deferred action status request.  Id.  Defendant's counsel also notes that because Defendant is a citizen of Honduras, his return to that country may subject him to possibility of "torture," and if he can prove this to an immigration judge, he may be granted relief from removal pursuant to "the Convention Against Torture (8 C.F.R. 208.16-18)."  Doc. No. 31, 5.

Finally, Defendant, in his Brief, notes that the Executive Action presently faces a legal challenge with regard to "the constitutionality of its policies."  Doc. No. 31, 6.  Presumably, Defendant is referring to the lawsuit filed by 17 States against the Federal Government and its key Administrators who oversee customs and immigration in this country.  *See State of Texas et al., v. United States of America, et al.*, 1:2014cv00254 (filed December 3, 2014).  Defendant

notes that this lawsuit challenges (*inter alia)* the President's authority to enact the "expansive grants" of deferred action status with the Executive Action.

Again, because of the effect the November 20, 2014 Executive Action has had on the rights of the undocumented immigrants such as Defendant in this case, the Court finds that the relevant law is "unsettled," and the Court has serious concerns about the impact its sentence may have on the rights of this particular Defendant.

### D.   Analysis of the Applicability of the Executive Action to Defendant

As noted many times above, while Defendant does not fall within the three (3) Priorities for deportation/removal from the United States, he likewise is not conclusively within one of the newly created and/or expanded categories for deferred action status.  If Defendant were to fall within the newly created category (parents of a U.S. Citizen and/or permanent resident child), or if he were part of the expanded category (Deferred Action for Childhood Arrivals, "DACA"), he may be entitled to additional "benefits" or "rights" as an undocumented immigrant.  For example, he may be entitled to the substantive work benefit and entitlements offered through the Executive Action.

The bottom line for this Defendant is that although he does not fall into <u>any</u> newly created or expanded deferment category, he does not fall into any of the three (3) Priority categories either.  Thus, he is in "no-man's land" under the Executive Action.  However, based on the information obtained by this Court so far as it pertains to this Defendant, the Court concludes he is more "family" than "felon."

### E.   Constitutional Arguments that the Executive Action Should Apply to Defendant

Not only has the Court considered whether the President exceeded his constitutional authority by issuing the November 20, 2014 Executive Action – and, as noted above, concludes

that he did -- but the Court also concludes that the Executive Action may violate the inherent and constitutional rights of some of the undocumented immigrants, such as this Defendant. *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his [or her] status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this county is unlawful, have long been recognized as persons guaranteed due process of law by the Fifth and Fourteenth Amendments.").

Although it may seem counterintuitive that the Constitution, a document created to protect the citizens of this Nation, can endow undocumented immigrants illegally residing in this country with any constitutional rights, the Supreme Court of the United States has ruled that these individuals are entitled to be treated humanely and, at least on a procedural level, are to be afforded with certain constitutional rights and protections.

For example, in *Padilla v. Kentucky*, 559 U.S. 356 (2010), the Supreme Court held that undocumented immigrants, who, by pleading guilty to a crime, would face the "automatic" civil penalty of deportation in a collateral proceeding, are entitled to effective assistance of counsel under the Sixth Amendment. The Supreme Court has also concluded that undocumented immigrants possess a Fifth Amendment right to due process where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction and there must be some meaningful review of the administrative proceeding. *United States v. Mendoza-Lopez*, 481 U.S. 828, 841 (1987) ("Persons charged with crime are entitled to have the factual and legal determinations upon which convictions are based subjected to the scrutiny of an impartial judicial officer.").

In *Padilla*, the Supreme Court, summarizing the Nation's legislative history with respect to the treatment of undocumented immigrants, noted that:

The Immigration Act of 1917 (1917 Act) brought "radical changes" to our law.  S.Rep. No. 1515, 81st Cong., 2d Sess., pp. 54–55 (1950).  For the first time in our history, Congress made classes of noncitizens deportable based on conduct committed on American soil.  *Id.*, at 55. Section 19 of the 1917 Act authorized the deportation of "any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States . . . ." 39 Stat. 889.  And § 19 also rendered deportable noncitizen recidivists who commit two or more crimes of moral turpitude at any time after entry. *Ibid*.  Congress did not, however, define the term "moral turpitude."

While the 1917 Act was "radical" because it authorized deportation as a consequence of certain convictions, the Act also included a critically important procedural protection to minimize the risk of unjust deportation: At the time of sentencing or within 30 days thereafter, the sentencing judge in both state and federal prosecutions had the power to make a recommendation "that such alien shall not be deported." *Id*., at 890.

This procedure, known as a judicial recommendation against deportation, or JRAD, had the effect of binding the Executive to prevent deportation; the statute was "consistently . . . interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," *Janvier v. United States*, 793 F.2d 449, 452 (2nd Cir. 1986).  Thus, from 1917 forward, there was no such creature as an automatically deportable offense.  Even as the class of deportable offenses expanded, judges retained discretion to ameliorate unjust results on a case-by-case basis."

559 U.S. 361-362 (footnotes omitted).

The plurality of the Supreme Court in *Padilla* further explained:

In light of both the steady expansion of deportable offenses and the significant ameliorative effect of a JRAD, it is unsurprising that, in the wake of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Second Circuit held that the Sixth Amendment right to effective assistance of counsel applies to a JRAD request or lack thereof, see *Janvier*, 793 F.2d 449.  See also *United States v. Castro*, 26 F.3d 557 (C.A.5 1994).  In its view, seeking a JRAD was "part of the sentencing" process, *Janvier*, 793 F.2d, at 452, even if deportation itself is a civil action.  Under the Second Circuit's reasoning, the impact of a conviction on a noncitizen's ability to remain in the country was a central issue to be resolved during the sentencing process—not merely a collateral matter outside the scope of counsel's duty to provide effective representation.

> However, the JRAD procedure is no longer part of our law.  Congress first
> circumscribed the JRAD provision in the 1952 Immigration and
> Nationality Act (INA), and in 1990 Congress entirely eliminated it, 104
> Stat. 5050.  In 1996, Congress also eliminated the Attorney General's
> authority to grant discretionary relief from deportation, 110 Stat. 3009–
> 596, an authority that had been exercised to prevent the deportation of
> over 10,000 noncitizens during the 5–year period prior to 1996, *INS v. St.
> Cyr*, 533 U.S. 289, 296, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001).  Under
> contemporary law, if a noncitizen has committed a removable offense
> after the 1996 effective date of these amendments, his removal is
> practically inevitable but for the possible exercise of limited remnants of
> equitable discretion vested in the Attorney General to cancel removal for
> noncitizens convicted of particular classes of offenses.  See 8 U.S.C. §
> 1229b.  Subject to limited exceptions, this discretionary relief is not
> available for an offense related to trafficking in a controlled substance. See
> § 1101(a)(43)(B); § 1228.

*Id.* at 363-64 (footnotes omitted).

This historical review of the legislation enacted by Congress demonstrates that neither this Court, nor any executive, can "cancel" an undocumented immigrant's removal/deportation from this country if that non-citizen commits a removable offense.  However, the *Padilla* Court recognized that when Congress stripped the JRAD procedure from immigration law, an undocumented immigrant's right to effective assistance of counsel under the Sixth Amendment grew in importance.  Thus, the *Padilla* Court concluded:

> It is our responsibility under the Constitution to ensure that no criminal
> defendant – whether a citizen or not – is left to the "mercies of
> incompetent counsel."  *Richardson*, 397 U.S., at 771, 90 S.Ct. 1441.  To
> satisfy this responsibility, we now hold that counsel must inform her client
> whether his plea carries a risk of deportation.  Our longstanding Sixth
> Amendment precedents, the seriousness of deportation as a consequence
> of a criminal plea, and the concomitant impact of deportation on families
> living lawfully in this country demand no less.

*Id.* at 374.

Having discerned that an undocumented immigrant's right under the Sixth Amendment to counsel appears well-settled, this Court next turns its attention to the due process rights afforded

to undocumented immigrants under the Fifth Amendment.[9]  The Supreme Court in *Mendoza-Lopez*, 481 U.S. 828 (1987), held that a person – even an undocumented immigrant – who stands charged with a crime is entitled to have the factual and legal determinations upon which his or her conviction is based, subjected to the scrutiny of an impartial judicial officer.

In the *Mendoza-Lopez* case, the Supreme Court concluded that Congress did not intend the validity of a deportation order to be contestable under 8 U.S.C. § 1326 (setting forth the penalties for re-entry of removed aliens).  481 U.S. at 837 ("That Congress did not intend the validity of the deportation order to be contestable in a § 1326 prosecution does not end our inquiry.")  The Supreme Court noted that in all other aspects of our justice system, when a determination, made in an administrative proceeding, plays a "critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding."  *Id.*, at 837-38, *citing Estep v. United States*, 327 U.S. 114, 121–122 (1946); *Yakus v. United States*, 321 U.S. 414, 444, (1944); *cf. McKart v. United States*, 395 U.S. 185, 196–197 (1969).

More recently, in reliance upon the Supreme Court's decision in *Mendoza-Lopez*, the United States Court of Appeals for the Tenth Circuit and the United States District Court of the Southern District of New York have concluded that if an underlying deportation order violates a

---

[9] In *Mathews v. Diaz*, the Supreme Court framed the scope of Due Process rights afforded to undocumented immigrants as follows:

> There are literally millions of aliens within the jurisdiction of the United States. The Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these persons from deprivation of life, liberty, or property without due process of law.  *Wong Yang Sung v. McGrath*, 339 U.S. 33, 48-51, 70 S.Ct. 445, 453-455, 94 L.Ed. 616, 627-629; *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140, 143; see *Russian Fleet v. United States*, 282 U.S. 481, 489, 51 S.Ct. 229, 231, 75 L.Ed. 473, 476.  Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection. *Wong Yang Sung*, *supra*; *Wong Wing*, *supra*.

*Matthews,* 426 U.S. 67, 77 (1976).

defendant's due process rights, that underlying order cannot form the basis for the prior deportation element in the illegal re-entry charge. *See U.S. v. Perez-Madrid*, 71 Fed.Appx. 795, 798 (10th Cir. 2003) ("[T]o prevail on a collateral challenge to a prior deportation hearing the defendant has the burden to demonstrate "that the deportation hearing was fundamentally unfair, and that it deprived him of a direct appeal."); *United States v. Nieto-Ayala*, 05 CR. 203 (LMM), 2005 WL 2006703, *5 (S.D.N.Y. August 18, 2005) ("[T]he underlying deportation order violated defendant's due process rights and therefore cannot be the basis for the prior deportation element in the illegal reentry charge.").

Turning to the facts of this case, it is important to note that on October 21, 2014, this Defendant pled guilty to the felony offense of re-entry of a removed alien in violation of 8 U.S.C. § 1326. He was represented by his current counsel, Alonzo Burney, a well-respected criminal defense lawyer, appointed to represent Defendant pursuant to the Criminal Justice Act. On November 20, 2014, the Executive Action on immigration was announced by President Obama. On November 24, 2014, the Court ordered the parties in this case to brief the impact, if any, the Executive Action of November 20, 2014 would have on this Defendant. Doc. No. 26. On December 3, 2014, Defendant's counsel, Attorney Burney, filed a Motion to Appoint Counsel specifically stating that "counsel has need of expert assistance in immigration law to file such a brief and continue competent representation of the defendant." Doc. No. 28. The Motion also stated, "[h]erein counsel does not possess the necessary background in immigration law to file the brief [ordered by the Court at document 26]." Id. The Court promptly granted the Defendant's request for assistance and an immigration attorney was appointed.[10]

---

[10] This request by Attorney Burney, a criminal defense lawyer, who sought – and was given – assistance from an immigration attorney underscores Justice Alito's concurrence in *Padilla, supra.*, where he noted that a "criminal defense attorney should not be required to provide advice on immigration law, a complex specialty that generally lies outside the scope of a criminal defense attorney's expertise. On the other

Given the statements made by Attorney Burney in his Motion to Appoint Counsel, the Executive Action has changed the legal landscape and accomplished criminal counsel, such as Attorney Burney, are recognizing the need to consult with attorneys experienced in immigration matters.  Because the Executive Action was announced shortly after this Defendant's change of plea hearing, this Court is willing to consider a request to withdraw his guilty plea, should Defendant choose to file the same.

Moreover, while this Court fully acknowledges that in 2002, when Congress created the Department of Homeland Security and charged this new Department with the responsibility for prioritizing the removal of certain undocumented immigrants,[11] Congress did not leave the Department totally devoid of any guidelines as to how to prioritize deportation among the millions of undocumented immigrants.  As the Supreme Court noted in *Arizona v. United States*:

> Federal governance of immigration and alien status is extensive and complex. Congress has specified categories of aliens who may not be admitted to the United States. See 8 U.S.C. § 1182.  Unlawful entry and unlawful reentry into the country are federal offenses.  §§ 1325, 1326. Once here, aliens are required to register with the Federal Government and to carry proof of status on their person.  See §§ 1301–1306.  Failure to do so is a federal misdemeanor.  §§ 1304(e), 1306(a).  Federal law also authorizes States to deny noncitizens a range of public benefits, § 1622; and it imposes sanctions on employers who hire unauthorized workers, § 1324a.

132 S.Ct. 2492, 2499 (2012).

---

hand, any competent criminal defense attorney should appreciate the extraordinary importance that the risk of removal might have in the client's determination whether to enter a guilty plea."  559 U.S. at 387-88.  It also underscores the inextricable nexus between criminal proceedings for the crime of "reentry of a removed alien" that occur in the federal district courts and which nearly always result in guilty pleas, and the subsequent deportation of person through an administrative proceeding, which generally takes place outside the purview of the district courts.

[11] See Homeland Security Act of 2002, Pub. L. No. 107-296, § 402(5), 116 Stat. 2135, 2178 (codified at 6 U.S.C. § 202(5)).

However, the Executive Action issued by the President on November 20, 2014 essentially conferred deferred action status[12] on a group of undocumented immigrants who were parents to legal permanent residents or citizens of the United States.  Deferment action recipients may apply for a work authorization documentation if they can demonstrate an "economic necessity for employment" (8 C.F.R. § 274a.12(c)(14); see 8 U.S.C. § 1324a(h)(3)), and they will temporarily cease accruing "unlawful presence" for purposes of 8 U.S.C. § 1182(a)(9)(B)(i) and (a)(9)(C)(i)(I).  8 C.F.R. § 214.14(d)(3); 28 C.F.R. § 1100.35(b)(2).  Thus, by creating a subgroup of undocumented immigrants who were parents to legal permanent residents or citizens of the United States, and instructing that they be given deferred action status, the Executive Action endowed this "parent-group" with greater rights than this Defendant.

As noted above, Defendant does not fall into any of the three (3) Priorities outlined in the Department of Homeland Security's Memorandum regarding *Policies for the Apprehension Detention and Removal of Undocumented Immigrants*.   Thus, under the Executive Action, he is not a person that the Department would necessarily wish to deport in an expedited fashion.

However, this Defendant, possibly is not "a parent" as defined in a different Department of Homeland Security's Memorandum (*Exercising Prosecutorial Discretion with Respect to Individuals who Came to the United States as Children and with respect to Certain Individuals Whose are the Parents of U.S. Citizens or Permanent Residents*), also dated November 20, 2014. Therefore, this Defendant is possibly not entitled to the deferred action status that would enable him to defer deportation.

---

[12] "Deferred action" as explained by the Supreme Court in *Reno v. American-Arab Anti-Discrimination Committee,* "developed without express statutory authorization" and was originally "known as nonpriority and is now designated as deferred action."  525 U.S. 471, 484 (1999).  The Supreme Court Court went on to note that "[a]pproval of deferred action status means that, for the humanitarian reasons described below, no action will thereafter be taken to proceed against an apparently deportable alien, even on grounds normally regarded as aggravated."  *Id.*

Although this Court recognizes that the Memorandum providing the basis for the Executive Action on immigration has opined that the Executive branch can create such subcategories of undocumented immigrants, the Court has concerns that some familial bonds are treated differently than others.

Here, this Defendant appears to have been in the United States – and possibly continuously – from 2005 to the present.  He works for and has a close bond with his brother.  In light of the fact that Defendant does not fall into any of the three (3) Priority removal categories, this Court concludes that he is more "family" than "felon," and consistent with the over-arching sentiment behind the Executive Action, Defendant may be eligible for deferred action status and its substantial rights and benefits.

V.    **Conclusion**

This Court must determine the applicability, if any, of the Executive Action upon this Defendant.  Thus, first the Court must determine whether the Executive Action is constitutional.[13]  The Court holds that the Executive Action is unconstitutional because it violates the separation of powers and the Take Care Clause of the Constitution.  If, however, the Executive Action is lawful, the Court must determine if the Executive Action applies to this Defendant, who does not fall within one of the three (3) Priorities requiring deportation.  The record is undeveloped as to whether Defendant falls among the newly created "parent" category for deferred action or has some other argument for deferred action.   Thus, the Court sets forth the following schedule:

[13] The Court has not discussed any issues relating to the application of the Administrative Procedure Act ("APA") to this Executive Action.

**VI.    Order of Court**

AND NOW, this 16th day of December, 2014, IT IS HEREBY ORDERED THAT:

1.   On or before January 6, 2015, Defendant shall file a notice/motion (with supporting brief) of his decision to proceed in one of the following manners:

    a.   Seek to withdraw his guilty plea in light of the Executive Action;

    b.   Continue to sentencing on or before January 22, 2015, to time-served (approximately six (6) months imprisonment (the high end of the guideline range)) – with one year of supervised release to be served in the United States, so that he may pursue his rights (if any) pursuant to the Executive Action, or otherwise; or

    c.   Continue to sentencing on or before January 22, 2015, to time-served, with suspended supervised release, and with instruction to the United States Marshal Service to deliver Defendant to ICE.

2.   The Government shall file a Response to Defendant's notice/motion on or before January 12, 2015; and

3.   This Order does not impinge the right to file any other request or motion.


                                   s/ Arthur J. Schwab
                                   Arthur J. Schwab
                                   United States District Judge


cc:    All Registered ECF Counsel and Parties