



14-180

## MUND BAREEFAN-YAMASSEE NATIVE AMERICAN ASSOCIATION OF NATIONS
### A MUSCOGEE NATION

**Original Cherokee, Creek, Seminole, Shushuni, Washitaw, Mechica, Osage, Commanche, et al;**
**Treaty of Camp Holmes, 1835 (7 Stat. 474) MBCYNA-NAAN**

**U.S. Dept. of State Authentication #04010010-1 United Nations Ref. #337423-2010-05-06**
Cherokee Embassy, 658 North Treanor Avenue, Glendora California 91741
Tel: (626) 428-7669 / 714-928-6914   drjag49@yahoo.com

## IN THE SUPREME COURT OF THE MUND-BAREEFAN-YAMASSEE

*Let us put our minds together and see what kind of a future we can make for our children.* (Tatanka Yotanka, or Sitting Bull, December 15, 1890, who was killed while resisting arrest.)

*The primary object of the white school is to educate the mind; the primary essential of Indian education is to enlighten the soul.* (Francis Paul Prucha, 1984, " The Great Father: The United States and the American Indians " 201-2)

"*There have been periods where the folks who were already here suddenly say, 'Well, I don't want those folks,' even though the only people who have the right to say that are some Native Americans.* President Obama, 26 November, 201 I want to stamp the dictation right now as we speak to the microphone is on that would like to do some recording act 4, Chicago, on current immigration policy.

**TRIBAL COURT MOTION TO ASSUME JURISDICTION OVER IMMIGRATION MATTERS CONCERNING NATIVE AMERICANS AND TRIBES IN THE MATTER OF JUAN VAZQUEZ PUENTO, ID# 205508893, PUERTO ISABEL DETENTION CENTER, TEXAS.**

1

**PUERTO ISABEL DETENTION CENTER; BROWNSVILLE, TEXAS**

To: Name of Immigration Judge, N/A

    Name/address of court N/A

    E-mail address of The Court  N/A

To: Mr. Jesus Vazquez

    Brownsville Prosecutor

    Tel: 956.547.1801

INTRODUCTION

Native Americans have been disenfranchised and marginalized since the 1830s in matters of land rights, cultural freedom from forced assimilation, political self-determination, protection against illegal encroachments, forced relocation and transmigration, and treaty rights. These take center stage despite the passage of the Indian Civil Rights Act of 1968.

This Tribal Court brings the following issues of immediate concern to the attention of the United States government:

1. The unnecessary apprehending and unlawful arresting of Enrolled Tribal Members of the Mund-Bareefan Yamassee Association of Nations (hereinafter "Nationals") is offensive to the U.S. Constitution, treaty laws, and federal Indian laws which acknowledge and recognize tribal sovereignty and immunity. These actions by the United States government through its agencies are totally prejudicial to the administration of justice.

2. The United States government must reconsider applying **Title 8** of the United States Code to these Nationals because they are Native Americans who have unlimited access to *Indian country* America. Title 8 may be relevant to undocumented aliens, but certainly is an unwarranted overreach for Nationals.

3. The United States government should not break the very laws its Congress has passed to ensure the safety, protection and preservation of tribal sovereignty and immunity. These are not ultra-modern concepts but

consecrated legal principles that were extracted from international law which evolved and developed into federal Indian law that found a permanent home in American jurisprudence.

4. The fundamentals that underlie the entire field of federal Indian law as enunciated by Felix S. Cohen in his seminal work *Handbook of Federal Indian Law* are:
a) an Indian nation possesses in the first instance all of the powers of a sovereign state;
b) the federal government has broad powers and responsibilities in Indian affairs; and
c) state authority in Indian affairs is limited.

The *Handbook* is the 'go to' source for scholars, lawyers and judges when handling or dealing with Native American Indian affairs.

This Tribal Court ardently hopes the United States will consult with the *Handbook* when responding to this Tribal Court's **Motion To Assume Jurisdiction Over Immigration Matters Concerning Native Americans and Tribes.**

PRINCIPAL QUESTION
1. Is the United States government constitutionally mandated to pass laws for regulating immigration into *Indian country* as defined in **Title 18 United States Code § 1151** when seen through the lens of **Article 1, section 8, clause 4** of the U.S. Constitution?

1. Article 1, section 8, clause 4 of the U.S. Constitution provides that Congress shall "establish an uniform *Rule* of Naturalization, and uniform *Laws* on the subject of Bankruptcies throughout the United States."

2. The question the United States government must ask itself is: Why did the framers and ratifiers of the U.S. Constitution use the word "Rule" and the word "Laws" for two separate areas of substantive law when one word – "Laws"– would have sufficed for both naturalization and bankruptcies?

3

Oversight on the part of the Committee on Detail of 1786 headed by Charles Pinckney of South Carolina is a poor excuse and an utterly invalid explanation because these were brilliantly adept and qualified men. Edmund Randolph of Virginia, Governor Morris ("penman of the Constitution"), and James Madison labored over the first drafts that underwent many refinements and rewrites until finally published and distributed. On July 2, 1788, nine of the thirteen States ratified the new Constitution in its original form. The other four States waited for the Bill of Rights to be included into the new Constitution although satisfied with the seven Articles.

3. The use of the word "Rule" instead of "Laws" could very well be premised upon the fact that beginning with the arrival of Columbus, the Spanish conquistadors, and the Pilgrims in the *Mayflower*, and others, the issue of visas and passports, otherwise a legal requirement, were moot, unnecessary, and quite irrelevant until Ellis Island was opened for immigration business in 1891. In 1809, the Steerage Act required that ship captains must *submit manifests with information about immigrants* onboard to the Collector of Customs, the secretary of state, and Congress. This Tribal Court is quite certain that early 15th century explorers must have carried cargo and passenger manifests that substituted the roles of visas and passports with consent to enter coming from the issuer of these documents in Europe, and not the consent of the Natives of the "New World."

4. When thousands came huddling and flocking to the "New World," the United States government began making its immigration "laws," not "Rules" as required by Article 1, section 8, clause 4 of the U.S. Constitution. In other words, they made laws that were not permitted by the Constitution. Congress has 17 functions to perform under Article 1, section 8 of the Constitution. Passing immigration "laws" is not one of them. Establishing a uniform Rule for Naturalization is the extent of this congressional power.

5. **Article 1, section 8, clause 18, U.S. Constitution,** says that Congress shall "make all Laws which shall be necessary and *proper* for carrying to Execution the *foregoing* Powers . . ." as mentioned in the other 17 clauses. This Tribal Court is of the opinion based on the text and substance of that

4

particular constitutional provision that making immigrations laws is not only not *proper,* but it is certainly not one of the *foregoing* powers mentioned in clause 1 to clause17 of Article 1, section 8. Immigration laws are therefore *ultra vires* the Constitution unless permission is sought from the Native Americans as to who is eligible to be admitted into *Indian country* as defined in Title 18 United States Code § 1151, or under the provisions of the treaties concluded between Indian Tribes and the United States government as contemplated under Article VI, section 2, U.S. Constitution.

6. The next constitutionally credible answer as to why the word "Rule" was used instead of "laws" for immigration could be that the framers and ratifiers were smitten by conscience and remorse that without the permission, consent, and approval of the Natives Americans they had occupied and permanently settled in a foreign land where these Natives had lived for thousands of years relying solely on their culture, mores, traditions and customs to guide and guard their lives. Historical annals tell us that when Captain Cook arrived in Maori New Zealand, he and his crew sought the permission of the Maori chiefs before unfurling the Union Jack. Native Americans did not receive such courtesy from the early European settlers. An invader-occupier-settler has no right under international law to annihilate the Natives, or to destroy their lifestyles in efforts to impose colonization.

7. The concept of "just war" was unjustified because natives did not mount an all out war against these usurpers. The framers and ratifiers of the Constitution were very aware of Papal Bulls and the writings of Franciscus de Victoria, *De Indis et de Iure Belli Relectiones* 115-128 (Ernest Nys ed., J. Bate trans., Craenigie Institution 1917) (orig. ed. 1557) regarding the sacrosanct rights of Natives that Pope Innocent IV in the 13th century chose not to recognize. The writings of de Victoria impelled Pope Paul III in 1537 to issue the papal bull *Sublimus Deus* which clearly mandated that the Natives' rights to liberty and property must be accepted, acknowledged, respected and recognized. Later writers like Hugo Grotius and Emmerich de Vattel, pioneers in international law, accepted de Victoria's theory of Indian title in the 16th, 17th and 18th centuries. The writings and works on Native law, primitive law, and international law was well covered by Aristotle,

5

Plato, John Locke, Thomas Hobbes, William Blackstone, Jean-Jacques Burlamaqui, Jean Bodin, Jeremy Bentham, David Hume, Descartes, and John Stuart Mill. Our framers and ratifiers were very well learned and informed in these foundational political science matters.

The government of the United States will be hard pressed to challenge these facts because the formative years of this republic owe much to the rich writings of all these authors and thinkers mentioned above that shaped our concepts of a limited government with states' rights and rigfhts of indigenous peoples.

8. But, this Tribal Court is more than convinced that the word "Rules" instead of "Laws" was used to stave off attacks by learned men in the law who would and could question the motive(s) behind this usage of "Rule" for Naturalization and "Laws" for bankruptcies. It is submitted that this paves the way for only one interpretation without embarking on a journey of deep and unnecessary casuistry. A rule is not a law. It is more of a description and a prescription capable of being changed whenever expedient by those at the workplace to remedy a localized problem. A law, on the other hand, needs the work of an entire legislature where discussions, debates and deliberations become necessary for the law to last for a long period of time in order to encompass a whole community of people whose welfare, safety and security are paramount to the sovereign state.

9. Today, immigration laws have evidently overshadowed the original intent of the Constitution. When lawyers and judges add to the fabric of the Constitution, instead of ironing out the wrinkles, they are inventing rights never mentioned or intended in that sacred document that we revere as the supreme law of the land. Our judges are required to be patrolling the constitutional borders to make sure there are no encroachments into its intent, extent and content. We stand at the crossroads of understanding how much power Congress is authorized to expend under the concept of a limited government with a written Constitution in the affairs of immigration. The United States government cannot ignore the Native American presence and standing on the issue of immigration because all immigration is happening in

6

*Indian country*. Turning a deaf ear, or casting a Nelson's eye on this issue is akin to denying and rejecting consecrated legal principles that developed into federal Indian law.

ISSUES PRESENTED
a) Numerous Treaties concluded between the Native Americans and the United States government **do not** mention immigration.
b) The U.S. Constitution does not grant power and authority to the President of the United States to issue Executive Orders that takes on the makes immigration laws.
c) Native American Tribes have a pre-constitutional right to define tribal membership which includes the right to naturalize aliens after adoption proceedings are concluded in a tribal court.

1. It is, therefore, not a question of an implicit understanding or a tacit acquiescence. *Expressum facit cessare tacitum* – the expression of one thing excludes the implication of something else. *Expressio unius est exclusion alterius* – mentioning one thing may exclude another thing. If the Treaty does not mention immigration, or taxation, then the Congress has no power to make laws germane to immigration, or taxation, where a Native American right is at stake, or worse, threatened. Where the Constitution is silent about the President issuing Executive Orders germane to immigration, the President must obey the supreme law of the land. He is not above the law. He cannot innovate, or create new rights and entrench it into federal Indian law. That's not the executive's functions under the doctrine of the separation of powers. The recent statement by President Obama to issue an Executive Order granting immunity and amnesty to about five million illegal aliens in *Indian country* is an unconstitutional effort at grabbing legislative power which is out of bounds to the executive. Native American tribal governments must be consulted whether these illegal aliens are eligible to admittance into *Indian country* while our Nationals are being treated like pariahs.

2. The President of the United States has no such powers although all presidents have issued executive orders in the past. Brian R. Dirck, a

7

political scientist explained that an executive order "*is simply presidential directives issued to agents of the executive department by its boss.*" The issuance of executive orders took on unconstitutional law-making functions when President Lincoln issued the 1863 Emancipation Proclamation before the passage of the 13th, 14th and 15th Amendments. Some notable executive orders were struck down by the U.S. Supreme Court. President Truman's Executive Order 10340 in <u>Youngstown Sheet & Tube Co. v. Sawyer, 343 US 579 (1952)</u> placed all steel mills in the country under federal control. This was found invalid because it *attempted to make law, rather than clarify or act to further a law put forth by the Congress or the Constitution.* The U.S Supreme Court correctly interpreted Article II, section 3, which grants the President the power "to Take Care that the laws of the United States are faithfully executed." This is not a law-making power. This does not require a linguistics expert to interpret its substance and spirit.

This Tribal Court submits that it is not a herculean task to fathom the plain meaning of the word "execute." The Constitution does NOT give the President of the United States power or authority to issue Executive Orders as a substitute for legislation especially when legislation does not comport with establishing a uniform "*Rule* for Naturalization." A proclivity became a habit. A habit became a convention. And now, a convention takes on the trappings of **law**. This is an affront to the rule of law. This is a constitutional aberration. It need to be addressed and resolved.

3. Whether a Tribal Court has the power and authority through a Tribal Judge to issue a Certificate of Adoption is unambiguously stated in **25 United States Code § 372(a)** which mandates that "adoption matters of a Judge or decree of an Indian tribe is acceptable and recognized for tribal adoption by *Indian custom*." This is a federal law that allows this Tribal Court to adopt and enroll qualified people to become Nationals of an Indian tribe. When the United States claims sole rights to making and enforcing immigration laws, it does not mean that **25 United States Code § 372(a)** is to be ignored, and neither does it mean it has been repealed, or waiting to be repealed. This federal law is in fact telling the Unites States government that a Tribe has all the rights, power and authority to define its membership rolls

8

through adoption. After the passage of the 1934 Indian Reorganization Act and the 1968 Indian Civil Rights Act, Native Americans and Tribes are clearly identified as distinct political communities with a separate agenda in order to maintain their traditions, mores and customs.

4. The U.S. Supreme Court and federal courts have declared in several cases that a **Tribe's right to define its membership** in its Tribal rolls is the hallmark of tribal sovereignty that predates the Constitution. There are no conditions or caveats attached to this right. The apex court must have contemplated the aphorism of *Indian country* when these cases were decided:
Santa Clara Pueblo v. Martinez 436 U.S. 49, 72 (1978); Smith v. Babbitt, 875 F.Supp. 1353,1360 (D. Minn. 1995); Waldron v. United States, 143 F. 413 (C.C.D.S.D. 1905); U.S. v. Canza, 260 U.S. 377, 382 (1922); United States v. Antelope, 430 U.S. 641, 646 (1977); Native American Church v. Navajo Tribal Council, 272 F. 2nd 131 (10th Cir. 1959); Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., 8 Cir., 231 F.2d 89; Ex parte Crow Dog, 109 U.S. 556, 3 S. Ct. 396, 27 L. Ed. 1030; Barta v. Oglala Sioux Tribe of Pine Ridge Res., 8 Cir., 259 F.2d 553; United States v. United States Fidelity & Guaranty Co., 300 U.S. 506. 60 S.Ct. 653, 84 L.Ed. 894; Toledo v. Pueblo De Jemez, D.C., 119 F. Supp. 429; Talton v. Mayes, 163 U.S. 376, 377, 16 S. Ct. 986, 41 L. Ed. 196; Adams v. Murphy, 8 Cir., 165 F. 304; Thebo v. Choctaw Tribe of Indians, 8 Cir., 66 F. 372;

5. This Tribal Court is sufficiently satisfied and convinced that the apex court developed a justifiable sense of justice for Native Americans and Tribes over the years following the Removal Era of the 1930s when the Cherokees were forced upon the Trail of Tears when President Andrew Jackson took upon himself to remove and dislocate Native Americans from *Indian country* Georgia to *Indian country* Oklahoma. An argument can be made that if Native Americans had the power and the resources, they would not hesitate to remove all aliens who came into *Indian country* without visas, passports or other travel documents between 1492 and the early 1700s when immigration meant traveling from one country to entering a host country without the Natives' permission because they were "savage" and had not

9

been indoctrinated with Christianity and western civilization. Today, to reiterate, with the passage of the Indian Reorganization of 1934 and the Indian Civil Rights Act of 1968, Native Americans and Tribes have a stronger footing in American jurisprudence under federal Indian law that draws on history, anthropology, ethnography, psychology, political science, economics, philosophy and religion.

6. Unlawful aliens have long been recognized as persons guaranteed 5th & 14th Amendments due process of law: <u>Yick Wo v. Hopkins, 6 S.Ct. 1064 (1886); Wong Wing v. U.S., 16 S.Ct.977 (1896); Shaughnessy v. Mezei, 73 S.Ct. 625 ( 1953); Mathews v. Diaz, 96 S. Ct. 1883 (1976); Plyler v. Doe, 102 S. Ct. 2382 (1982).</u>  In January 2014 an **undocumented alien** was permitted to practice law in the State of California. See <u>In re SERGIO C. GARCIA</u> on Admission, Case Number S202512, Supreme Court of California. By enacting a state law to accommodate a federal law, Title 8 § 1621 that restricts yet authorizes an undocumented alien to obtain a professional license, the State of California was able to issue Sergio C. Garcia a bar license to practice law in California. The state enactment became Bus. & Prof. Code, § 6064, subd. (b); Stats. 2013, ch. 573, § 1, enacting Assem. Bill No. 1024 (2013-2014 Reg. Sess.) as amended Sept. 6, 2013.) The new legislation became effective on January 1, 2014. Sergio C. Garcia is from Mexico.

In light of the passage of California's enactment to accommodate an unlawful alien's issuance of a professional license, an argument can be made that laws should be passed to allow immigration into *Indian country* regulated by tribal governments. In <u>Native American Church v. Navajo Tribal Council, 272 F. 2d 131, 133 (8th Cir. **1959**</u>), the federal appellate court declared that "Indian tribes are not States. They have a status *higher* than that of States. They . . . are possessed of all power limited only to the extent that they have expressly been required to surrender them by the superior sovereign, the United States." This was before the passage of the **1968** Indian Civil Rights Act when the United States abruptly realized that the Bill of Rights did not include protections for Native Americans.

10

Curiously, the Nationals are not accorded these rights that "unlawful aliens" are eligible for under applicable laws and the U.S. Constitution. Instead they are thrown into prison awaiting deportation from *Indian country* America where they rightfully belong. Perhaps the time has come for Tribes to beef up their Enforcement Units to discourage DHS, ICE and Border Patrol agents from trespassing on Native American rights in *Indian country*.

7. The Yamassee Mund-Bareefan Tribe, a clan of the Muscogee Tribe, concluded a Treaty with the United States government called the Treaty of Camp Holmes, 24 August 1835 (7 Stat.474) which is unequivocal about Tribal members traveling to and from Mexico. See http://digital.library.okstate.edu/kappler/Vol2/treaties/com0435.htm#mn3 Compiled and edited by Charles J. Kappler. Washington : Government Printing Office, 1904.

> *Article 3, Treaty of Camp Holmes: There shall be a free and friendly intercourse between all the contracting parties hereto, and it is distinctly understood and agreed by the Comanche and Witchetaw nations and their associated bands or tribes of Indians, that the citizens of the United States are freely permitted to pass and repass through their settlements or hunting ground without molestation or injury* **on their way to any of the provinces of the Republic of Mexico, or returning therefrom**, *and that each of the nations or tribes named in this article, further agree to pay the full value for any injury their people may do to the goods or property of the citizens of the United States taken or destroyed, when peaceably passing through the country they inhabit, or hunt in, or elsewhere. And the United States hereby guaranty to any Indian or Indians of either of the said Comanche or Witchetaw nations, and their associated bands or tribes of Indians, a full indemnification for any horses or other property which may be stolen from them: Provided, that the property so stolen cannot be recovered, and that sufficient proof is produced that it was actually stolen by a citizen of the United States, and within the limits thereof.*

11

This Treaty has not been abrogated or repealed. It is still good law. When the U.S. government violates a Treaty it breaks the supreme law of the land – Article VI, section 2 of the U.S. Constitution is very clear on this point. Where did Congress derive this power to ignore and bypass a Treaty? The Treaty of Guadalupe Hidalgo of 1848 and the Gadsden Purchase of 1853 do not stipulate terms, impliedly or expressly, to abrogate or repeal the 1835 Treaty of Camp Holmes and neither did they terminate Article 3 of the Treaty of Camp Holmes that allowed free and unhindered passage between Texas and Mexico.

8. Sometimes, when a Tribe has started making inroads into applicable laws and constitutional provisions that are favorable to the Tribe's position, the Court tries to trump the situation by declaring that the Tribe is not a federally recognized tribe under the Federally Recognized Indian Tribes List Act, Pub. Law 103-454, 108 Stat. 4791. Some cases have declared otherwise. The unanimous Court in <u>Morton v. Mancari, 417</u> <u>U.S. 534 (1974)</u> held that "Indians maintain their special relationship with the United States even when they are *not* members of a federally recognized tribe." In <u>Delaware Tribal Business Comm. V. Weeks, 430 U.S. 73 (1977)</u>, the Court declared that "federal Indian law applies to Indians who do not belong to any federally recognized tribe." <u>Joint Tribal Council of the Passamaquoddy Tribe v. Morton, 528 F.2d 370 (1st Cir. **1975**)</u>, was a landmark decision regarding aboriginal title in the United States. The United States Court of Appeals for the First Circuit held that the Non-intercourse Act of **1790** applied to the Passamaquoddy and Penobscot, *non-federally-recognized Indian tribes*, and established a trust relationship between those tribes and the federal government that the state of Maine could not terminate.

All evidence seems to point to the fact that federal recognition of an Indian tribe is a congressional stance designed to disenfranchise the power and authority of treaties, and also to diminish the treaty-making powers with Indian tribes granted to the President under Article 2, section 2, clause 2 of the U.S. Constitution.

<u>Where then does the United States government obtain this seemingly unfettered power to refuse and deny free passage to these Nationals who carry ID cards and Certificates of Naturalization that are valid and recognized under treaty laws and federal Indian laws?</u>

9. The issue then becomes one in which the Department of Homeland Security (DHS), Border Patrol and the Immigration and Customs Enforcement (ICE) are intent in breaking federal laws each and every time they apprehend, arrest and imprison one of these Nationals for violating immigration "laws" when rule-making is the currency of constitutional law under Article 1, section 8, clause 4.

10. The United States government continues to breach treaties with impunity and in open defiance of decency, human rights, civilized behavior and conduct. When facing a superior argument, the government will quote and cite the Scriptures and the Constitution. When the Scriptures and the Constitution are referred to by those arguing a case against the United States government, the usual response is a curt and crisp statement that "church and state are separate." Usually, the inevitable added lash of the constitutional avoidance doctrine is delivered upon the crouching litigant especially by the U.S. Supreme Court. None of the *Federalist Papers*, one of the sources of the U.S. Constitution, mention the constitutional avoidance doctrine. *Federalist #78* grants federal judges the right to question congressional enactments under the power of judicial review if found to be repugnant to the Constitution.

11. Every litigation effort involving Native American rights is a crap-shoot where the Scriptures and the Constitution offer remedies and solutions to those whose misfortune it is to become unwilling "defendants" in a lawsuit affecting their rights with cross-border connections and affiliations. Terms like "plenary power," "implicit divestiture," "trust relationship," and "domestic dependent wards," have crept into the vocabulary of federal Indian law as an extra-constitutional political statement to the utter detriment of Native Americans wanting more than anything else to secure political and economic independence in *Indian country* America.

12. The relationship between the Yamassee Mund-Bareefan Nationals and Texas began a long time ago. A Texan fact-finding mission (the Teran Commission) in 1828, highly concerned about the influx of frontiersmen and settlers in overwhelming numbers from the United States into Texas (then a territory of Mexico), published and sent this Report to the Mexican Congress about the sinister aim of the American government employing a subtle form of encroachment fraught with ulterior motives:

*They commence by introducing themselves into the territory which they covet, upon pretense of commercial negotiations, or of the establishment of colonies, with or without the assent of the Government to which it belongs. These colonies grow, multiply, become the predominant party in the population; and as soon as a support is found in this manner, they begin to set up rights which it is impossible to sustain in a serious discussion . . . These pioneers excite, by degrees, movements which disturb the political state of the country . . . and then follow discontents and dissatisfaction, calculated to fatigue the patience of the legitimate owner, and to diminish the usefulness of the administration and of the exercise of authority. When things have come to this pass, which is precisely the present state of things in Texas, the diplomatic management commences: the inquietude they have excited in the territory . . . the interests of the colonists therein established, the insurrections of the adventurers, and savages instigated by them, and the pertinacity with which the opinion is set up as to their right of possession, become the subjects of notes, full of expressions of justice and moderation, until, with the aid of other incidents, the desired end is attained of concluding an arrangement as onerous for one party as it is advantageous to the other. Sometimes more direct means are resorted to; and taking advantage of the enfeebled state, or domestic difficulties, of the possessor of the soil, they proceed, upon the most extraordinary pretexts, to make themselves masters of the country, as was the case in the Floridas; leaving the question to be decided afterwards as to the legality of the possession, which force alone could take from them.* (House Exec. Docs., 25 Cong., 2 Sess. (Serial 332), No. 351, pp. 313-14). (emphasis added)

This Report is a classic study of the methodology, mechanics and machinations of acquiring territory belonging to another through coerced diplomacy and forced demography all made nice and legal through the powers of annexation and subsequent legislation. Texas, New Mexico, Arizona, California, and the Kingdom of Hawai'i fell prey to the same modus operandi.

In a parallel universe, Mexico could have sought Great Britain's help as a former foe of the Colonists, fought, clawed, and bled their way to reclaiming Texas under international law. But they could not, and did not because of an alarming lack of governmental accountability, responsibility and discipline no thanks to General Santa Anna. Today, the United States government labels the Nationals of the Yamassee Mund-Bareefan "illegal aliens with fake documents" owing to their eternal Mexican blood ties and other socioeconomic connections to *Indian country* America prior to the annexation of Mexican Texas.

13. Ultimately, the question is one of pure economics. People flock to *Indian country* America to realize the American dream of good-paying jobs, a better quality of life, and to build strong family ties to communities in the pursuit of life, liberty and happiness. That is the allure of the New World. The right to travel is sacrosanct especially to those who belong to the land and soil of *Indian country* America.

RELIEF SOUGHT

1. That Juan Vazquez Puente, and other Nationals, presently held in custody awaiting deportation be released under this Tribal Court's recognizance, and be further granted due process and equal protection of the laws in a fair hearing with the Tribal Court's participation asserting its tribal jurisdiction over this immigration matter.
2. The government of the United States must study the immigration issue with Native American leaders and tribal elders to determine the impact, scope, scale and effect of this contentious issue with all the

15

guidance afforded by consecrated legal principles, treaties, federal laws, federal court decisions, and previous executive orders.

3. That Nationals of the Yamassee Mund-Bareefan Tribe be allowed free and unhindered access to *Indian country* America's towns and cities until a meeting of minds has come to terms in matters relating to immigration.

4. The United States government to recognize the Certificates of Naturalization and Tribal ID cards that have been issued to these Nationals until a rock solid consensus is achieved in matters relating to immigration into *Indian country* America.

5. That the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICS) and the Border Patrol be apprised of this matter until a consensus can be reached regarding immigration into *Indian country* America without detriment to the Nationals.

Respectfully submitted this 25th day of December 2014.

*[signature]*

Judge Navin-Chandra Naidu
- Chief Justice, United Cherokee Republic of North America, Georgia; Mund-Bareefan Yamassee; Washitaw de Dougdamoundyah
- HM Attorney, General Kingdom of Hawai'i
- Judge Member #01798766, American Bar Association
- Member #1040751, International Bar Association
- Member # IIBA/NCN/1948, International Indigenous Bar Association, Paris, France.
- Permanent Representative, Native American Association of Nations, United Nations
- Member, National American Indian Court Judges Association

cc:
~ Director,
  U.S. Department of Justice
  Office of Tribal Justice
  950 Pennsylvania Avenue, NW
  Washington, DC 20530-0001

~ Chair,
  Senate Indian Affairs Committee,
  United States Senate
  838 Hart Office Building
  Washington, DC 20510

~ Assistant Secretary-Indian Affairs
  Office of Federal Acknowledgment
  Department of Interior,
  1849 C Street NW,
  Washington D.C. 20240

~ Bureau Of Immigration & Customs Enforcement
  *Resident Agent In Charge*
  1800 Paredes Line Road
  Brownsville, TX 78521
  Phone: (956) 542-7831

~ The Honorable Jeh Johnson
  Secretary of Homeland Security
  Washington, D.C.  20528

~ The U.S. Customs and Border Protection
  Resident Agent in Charge
  940 N. FM 511
  Olmito, Texas 78575
  Office: (956) 983-1100
  Fax: (956) 350-4243

## CERTIFICATE OF MAILING

I, Khalil M. Chaoui, a tribal lawyer, aver and attest under penalty of perjury that I have caused the foregoing Motion to be mailed to all the seven intended recipients this 29th, day of December 2014 via United States Postal Services certified mail return receipt requested.

_____

Khalil M Chaoui
Member # 02206928, American Bar Association
658 North Treanor Avenue
Glendora, California 91741
Tel: 714-928-6914